## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALZHEIMER'S INSTITUTE** | : | **CIVIL ACTION** |
| **OF AMERICA, INC.** | : | |
| | : | **NO. 10-6908** |
| **v.** | : | |
| | : | |
| **AVID RADIOPHARMACEUTICALS**, *et al.* | : | |

### MEMORANDUM OPINION

**Savage, J.**                                                    **March 30, 2015**

The defendants in this patent infringement case that resulted in a jury verdict in their favor have moved for an award of attorney's fees. Finding that this is an exceptional case entitling them to attorney's fees under 35 U.S.C. § 285, we shall grant their motions.

Section 285 of the Patent Act provides that the prevailing party may, in an exceptional case, be awarded reasonable attorney's fees. 35 U.S.C. § 285. The Act does not define "exceptional case." However, the Supreme Court has.

In *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), the Court held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Construing the statutory language according to its ordinary meaning, the Court referenced the dictionary definition of exceptional as "uncommon," "rare," or "not ordinary." *Id.* at 1756.

In conducting the exceptional case analysis, a court must exercise its discretion in light of the totality of the circumstances. *Id.* Among those factors relevant to the analysis are "frivolousness, motivation, objective unreasonableness (both in the factual and legal

components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 1756, n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, n.19 (1994)). This includes cases that are brought in subjective bad faith or assert exceptionally meritless claims. *Id.* at 1757.

In conducting its discretionary inquiry, the court makes its findings by a preponderance of the evidence. *Id*. at 1758. When determining whether a case is exceptional, a court may reweigh evidence the jury has already considered; but, it cannot substitute its findings for the jury's. *Door Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1314-15 (Fed. Cir. 2001) (citing *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572, (Fed. Cir. 1996)).

The jury determined that the plaintiff, Alzheimer's Institute of America, Inc. ("AIA"), was not the owner of the rights to the patent upon which it predicated this infringement action.[1]  Instead, it found that the University of South Florida ("USF") had not waived its ownership rights in the Swedish mutation invention.[2]  It also found that John Hardy, who was not disclosed on the patent application, was a co-inventor.

The evidence at trial amply showed that Ronald Sexton, AIA's principal, had conspired with John Hardy and Michael Mullan to defraud USF and Imperial College in London of their ownership rights in the invention.  They agreed not to list Hardy as a co-

---

[1] The factual background of the case and the historical details of how the invention, the Swedish mutation, was conceived and developed are recited in our summary judgment memorandum opinion ruling on Avid Radiopharmaceuticals ("Avid") and The Trustees of the University of Pennsylvania's ("Penn") motion challenging AIA's standing to bring this infringement action, *Alzheimer's Inst. of Am., Inc. v. Avid Radiopharmaceuticals*, No. 10-6908, 2011 WL 3875341 (E.D. Pa. Aug. 31, 2011), and the memorandum opinion ruling on AIA's post-verdict motion. 952 F. Supp. 2d 740 (E.D. Pa. July 1, 2013). Because the parties are familiar with those facts and the history, we shall not reiterate them.

[2] On summary judgment, we determined that the ownership rights to the invention vested in USF by operation of law. 2011 WL 3875341, at *8, *11.

inventor on the patent application.  Thus, Mullan was listed as the sole inventor on the patent application and assigned the patent rights to AIA.

The jury found that Mullan was not the sole inventor of the Swedish mutation invention and that Hardy was a co-inventor.  The evidence clearly demonstrated that Hardy had made a significant contribution to the invention, and that both Mullan and Hardy had collaborated to discover the Swedish mutation.  As we previously observed, there was abundant evidence that Hardy and Mullan had been working together on the project to identify the Swedish mutation before and at the time of conception.  When Hardy arranged to have the DNA sent to Mullan in Florida for the sequencing, the final step in the process, he was not a mere messenger or deliveryman.  Hardy was directing the process and substantially contributed to the invention.

Dr. Houlden testified that Hardy had concluded that the GT12 data suggested a mutation on the APP gene.[3]  He stated that Hardy had told him to send DNA to Mullan to be sequenced in Florida.[4]  Houlden knew that Mullan and Hardy jointly wanted the new mutations discovered in Florida rather than in London.[5]

Dr. Duff also corroborated Hardy's testimony.  She testified that although Hardy and Mullan knew there was a genetic abnormality in the Swedish families when they were in London, they deliberately held off on formally identifying the sequence mutations until they got to Florida.[6]

---

[3] 4/18/12 Tr. at 19:9-24, 110:10-19 (Houlden).

[4] 4/17/12 Tr. at 79:17-23, 97:3-5 (Hardy); 4/18/12 Tr. at 21:5-13 (Houlden); 159:16-20 (Goate).

[5] 4/18/12 Tr. at 32:21-23, 100:5-6 (Houlden).

[6] 4/18/12 Tr. at 206:16-207:6, 224:10-19, 232:4-7 (Duff).

Consistent with the plan to have the discovery of the mutation occur in Florida instead of the United Kingdom, Hardy had DNA samples sent to Mullan for sequencing. Having the sequencing done in Florida rather than in London was a step in furtherance of the conspiracy to avoid the inventions becoming the property of Imperial College or Athena.  At that point, Hardy and Mullan were working together on the project. They were both attempting to deceive Imperial College by having the sequencing done in Florida.

To avoid any claim of ownership by USF, Mullan arranged to have the sequencing in an off-campus, private laboratory even though USF had provided Mullan and Hardy a new laboratory dedicated to Alzheimer's research.  Once they had identified the Swedish mutation, Sexton, Hardy and Mullan sought USF's waiver of any rights in this discovery. They presented a "waiver letter" to USF's vice-president for research.  In their successful effort to obtain his signature on the letter, they led him to believe that the work on the Swedish mutation had been substantially completed while Hardy and Mullan were at Imperial College.

In furtherance of their conspiracy to deprive USF and Imperial College of ownership rights in the invention, Sexton, Hardy and Mullan agreed to omit Hardy's name from any publication reporting the discovery of the Swedish mutation.  They also omitted him as a co-inventor from the patent application.

AIA contends that this is not an exceptional case because the jury made no findings regarding the existence of a conspiracy or an intent to deceive the Patent and Trademark Office ("PTO") or USF.  It argues that because the defendants advanced several alternative theories in support of their claim that Hardy made a substantial contribution to the

discovery of the Swedish mutation,[7] the jury's verdict on inventorship could have been based on one of these alternate theories and was not necessarily based on a finding that there was a conspiracy or that Mullan or AIA intentionally misled the PTO.  AIA also argues that the jury's finding that USF did not knowingly waive its ownership rights in the Swedish mutation invention does not support a finding that AIA intentionally concealed the invention from USF because there was evidence that USF knew about Mullan's "research on the variation that became the Swedish mutation."

The evidence at trial clearly supports our findings that Sexton, Hardy and Mullan conspired to misrepresent the true inventorship of the Swedish mutation inventions in an effort to ensure that ownership of those inventions could not be claimed by Imperial College; and that they intentionally hid the discovery of the mutation from USF to avoid its claiming rights in the invention.  Because these findings are not inconsistent with the jury's findings, they form a sufficient basis for us to exercise our discretion in deciding to award attorney's fees.  *See Door Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1315 (Fed. Cir. 2001) (citation omitted).

AIA knew, when it brought this action, that it was not the legal owner of the patent. It devised the scheme to avoid the agreements Hardy and Mullan had with Imperial College and USF.  It knew that Hardy was a co-inventor who should have been disclosed to the PTO.  Despite this knowledge, it asserted that it was the rightful owner of the patent and brought this infringement action.  This conduct undoubtedly constitutes bad faith.

On both factual and legal grounds, this action was objectively unreasonable.  The

---

[7] The alternate theories included evidence of Hardy's position in the laboratory, role in the collaboration between him, Mullan and Dr. Lannfelt in Sweden, direction to Houlden of the initial experiments and relationship to Mullan.

deception, the planning, the execution of the scheme and the motivation of AIA, Sexton, Mullan and Hardy were hardly common or ordinary.  Indeed, their conduct was rare and beyond common decency.  They were motivated by ego and greed.  Bringing this action was nothing more than a perpetuation of the conspiracy.

Certainly, there is a need to consider deterrence in a case like this one.  Litigants must be discouraged from bringing an infringement action based upon a patent they know or should have known they do not rightfully own, especially where they defrauded the PTO and the rightful owner of the patent.  Such conduct should not be rewarded and without consequences.

The compensation factor, suggested by *Fogerty* as relevant, presents an interesting issue.  The jury did not determine that the defendants did not infringe the patent.  It merely found that Mullan was not the sole inventor and that USF had not waived its rights in the invention.  In other words, while handing the defendants a legal victory, the jury did not absolve them of infringement.

*Octane Fitness* requires us to exercise equitable discretion.  There are equities on both sides.  On the one hand, applying the exceptional case analysis, AIA should be held responsible for its bad faith and unreasonably bringing an action for infringing a patent that was unenforceable.  On the other hand, given the unusual posture of this case, the defendants should not be rewarded for acts of infringement that may have occurred.  Yet, the defendants did incur fees in determining the rightful owner of the invention.  Therefore, we shall grant the motions, but will scrutinize the bills closely in light of our equitable concerns.